Cleveland PARKER and Felicia Lynn
REYNOLDS *v.* STATE of Arkansas

CR 80-106                                        603 S.W. 2d 393
Supreme Court of Arkansas
Opinion delivered August 25, 1980

*Paul Johnson* and *William H. Craig*, for appellants.

*Steve Clark*, Atty. Gen., by: *Victra L. Fewell*, Asst. Atty. Gen., for appellee.

JOHN I. PURTLE, Justice. On June 18, 1979, appellants were tried jointly; appellant Parker was convicted of theft of property in violation of Ark. Stat. Ann. § 41-2203 (Repl. 1977), appellant Reynolds was convicted of theft by receiving in violation of Ark. Stat. Ann. § 41-2206 (Repl. 1977), and both appellants were also convicted of promoting prostitution in the first degree in violation of Ark. Stat. Ann. § 41-3004 (Repl. 1977). Parker received five years for theft and five years for promoting prostitution, and Reynolds received two years for theft by receiving and three years for promoting prostitution.

On appeal, appellants argue that the evidence was insufficient to sustain the verdicts and that the trial court erred in overruling appellant Reynolds' objections to cross-examination by the prosecuting attorney. We find there was sufficient evidence to sustain each conviction and that the court did not err in failing to overrule appellant Reynolds' objections to the cross-examination.

The facts in this case reveal that appellants Parker and Reynolds were living together in an apartment rented by

Reynolds. On or about October 11, 1978, Parker met Denise Wylie downtown and informed her that Reynolds wanted to see her at their apartment. She accompanied Parker to the apartment; but, when they arrived, Reynolds was taking a bath.

At that time, Parker asked Wylie if she wanted to learn how to make some money, and she said that the would. Parker produced a set of cards and proceeded to teach her a card game. The object of the game was for Wylie to pick out the black card out of the two red cards. The three cards were shown to her, turned face down, and shuffled about.

During the process of the game, Parker obtained possession of three rings from Wylie. His testimony, and that of Reynolds, was that Wylie lost the rings in a game of chance. Wylie's testimony was that she never intended to gamble or relinquish the rings and that Parker and Reynolds wrongfully refused to return the rings to her. One of the rings was a turquoise, one was a mother of pearl, and one was a wedding ring with a number of diamonds in it. The diamond ring was subsequently appraised by Lloyd Stanley, a gemologist, as having a value of $225. Later, Parker gave the rings to Reynolds who maintained possession of them.

Wylie testified that she repeatedly requested Parker and Reynolds to return her rings and even bargained to buy them back. Appellants contend that the rings were lost in a game of chance and they had the right to keep them and that they came into possession of the rings with the consent of the owner.

After a few days of begging, pleading, and negotiating, Wylie was unable to regain possession of her rings and called the Pulaski County Sheriff's office and complained that her rings had been stolen. A search warrant was issued and served on October 27, 1978, by deputy sheriffs from Pulaski County. The search was made at the premises located at 5910 Valley Drive, Apartment No. 2, and the three rings were recovered. Reynolds was wearing two the rings, and the third ring (diamond) was found in a ring box in a dresser drawer in a bedroom of the apartment.

When the officers entered the apartment with the search warrant, they found a young woman named Lynda Neese in one of the bedrooms which led to the second conviction in this case.

Although Lynda Neese made no complaints to the officers at that time, she subsequently informed the prosecuting attorney's office that she had been held against her will at the apartment and forced to perform acts of prostitution. Her testimony was that she was first taken to the appellants' apartment by a man named Donald Warren. Warren had apparently taken Neese to Parker because she would not "pull any tricks" for him. She stated that Warren sold her to Parker for $40.

She also testified that Parker ordered her into the bedroom shortly after she arrived at the apartment and told her to undress. At first she refused but he made a second demand and told her he would be back in a few minutes and she had better be undressed. Upon his return, she was undressed, and Parker took pictures of her in the nude. Subsequently, she was brought back into the living room where she was forced to undress again.

Shortly after Warren collected his $40 and left, Parker drove Reynolds and Neese to the area of 11th and Battery Streets for the purpose of picking up customers. Neese testified that Reynolds was to show her how to "pull tricks." However, before they "pulled" the first one, the police arrived, arrested them for loitering, and took them to the jail. In a short time, someone unknown to Neese posted bail for the women, and they were "put out on the street" again by Parker. According to Neese, Reynolds immediately performed acts of prostitution sufficient to pay the $57 it cost to get out of jail. Neese then engaged in her first "trick," and the customer paid $25 to Reynolds. Neese testified that she informed Reynolds she wanted to leave, but she was told if she left "she would get in trouble." On the second day, Reynolds called a man and talked with him. Parker then took Neese and Reynolds to meet the man. The man took Neese to a park, had intercourse with her, and paid Reynolds.

Neese admitted having intercourse four times and stated that each time Parker had driven them to the area and that each time Reynolds had collected the money.

On another occasion when Neese asked if she could leave, Reynolds replied, "If you leave you're going to get into trouble." On the first night, when Warren delivered Neese to Parker, and received the $40, Reynolds told Neese, "Look at this. You lost $20. You lost $40 and now you've got to stay here. I've gained the $40 plus you're my man's lady." On the same night, Parker took them in his car, put them on the street, and told them to "pull tricks." Neese further related that Parker told her if she didn't do what he told her to she was going to get into trouble.

There is no evidence that Parker directly received any of the money from the acts of prostitution performed by Neese. Reynolds always collected for the acts performed by her and Neese during the two days they worked together.

During the cross-examination of appellant Reynolds, the prosecuting attorney was allowed, over the objections of the appellant, to ask her about the amount of her income from her job at a local department store. The questions included the amount of rent paid on the apartment and the make of car she drove. Questions relating to acts of prostitution, either recent or remote, were permitted by the court.

We first consider the argument that the evidence was insufficient to sustain the verdict. The testimony presented was essentially that related in the facts above.

The statute on theft of property is Ark. Stat. Ann. § 41-2203 and provides:

(1) A person commits theft of property if he:

(a) knowingly takes or exercises unauthorized control over, or makes an unauthorized transfer of an interest in, the property of another person, with the purpose of depriving the owner thereof; or

8

(b) knowingly obtains the property of another person, by deception or by threat, with the purpose of depriving the owner thereof.

(2) * * *

(b) Theft of property is a class C felony if:

(i) the value of the property is less than $2,500 but more than $100; * * *

The statute declares that any person who knowingly takes or exercises unauthorized control over property of another with the purpose of depriving the owner of the property or knowingly obtains the property of another by deception or threat with the purpose of depriving the owner thereof is guilty of theft of property, which is a class C felony if the value of property is over $100 and less than $2,500. Although no value was placed on two of the rings, the testimony of Lloyd Stanley, a certified gemologist, was that one of the rings had a value of $225. We do not ignore the fact that the appellants testified that the witness voluntarily parted with the rings and that they were either theirs as a result of the game of chance or as security for the gambling debt. On the other hand, the witness testified that she never intended to gamble and she never willingly parted with her rings. Her testimony was that Parker asked to see the rings and refused to return them. Because both appellants were present at the time of this transaction, it is obvious that Reynolds knew the circumstances under which the possession of the rings was obtained. Certainly, the testimony of witness Wylie was substantial enough to support the finding that appellant Parker had obtained the rings by deception and had knowingly exercised unauthorized control over them. The jury has the sole right to determine which witness to believe.

The statute relating to the theft by receiving is Ark. Stat. Ann. § 41-2206 and provides:

(1) A person commits the offense of theft by receiving if he receives, retains, or disposes of stolen property of

another person, knowing that it was stolen, or having good reason to believe it was stolen.

\* \* \*

(5) \* \* \*

(b) Theft by receiving is a class C felony if:

(i) the value of the property is less than $2,500 but more than $100; or

\* \* \*

We have already concluded that Parker obtained the rings by theft as defined by the statute; therefore, the property was stolen within the meaning of Ark. Stat. Ann. § 41-2206. Reynolds had full knowledge of the entire transaction and of the witness's demands for the return of the property. The apartment was rented by Reynolds, and she lived in the apartment with Parker. No doubt, the jury was justified in finding that she had possession of the rings which were either removed from her hand or from the apartment which she rented.

Reynolds argues she was not in possession of the only ring which had a proven value in excess of $100; however, we have held that construtive possession occurs when the accused maintains control or the right to control property. When stolen property is found at a location which is under the joint control of the accused and other persons, it is sufficient to prove possession if there are additional factors which would link the accused to the possession. *Cary* v. *State*, 259 Ark. 510, 534 S.W. 2d 230 (1976); *United States* v. *Johnson*, 563 F. 2d 936 (8 Cir. 1977) cert. denied, 434 U.S. 1021 (1978).

The rule that this Court reviews the evidence in the light most favorable to the state and affirms if there is substantial evidence to support the conviction needs no citation. Nor do we need to cite authority that this Court does not substitute

its judgment for that of the trier of the facts if there is any sub-
stantial evidence to support the finding.

We now turn to the charge of promoting prostitution in
the first degree. Ark. Stat. Ann. § 41-3004 provides:

(1) A person commits the offense of promoting prostitu-
tion in the first degree if he knowingly:

(a) advances prostitution by compelling a person
by physical force or intimidation to engage in prostitu-
tion, or profits from such coercive conduct by another,
or

\* \* \*

It is not necessary that both appellants used physical
force or intimidation in order to be guilty of this charge. If
either of the appellants used force or intimidation and both
profited from such conduct, then both are guilty of the offense
charged. Lynda Neese testified that she was threatened by
Reynolds and Parker. She testified she was afraid to report
what had happened to her when the police made the search of
the premises. She also stated that when she threatened to
leave Reynolds told her, "If you leave you're going to get into
trouble." It is true that Neese testified no physical force was
ever inflicted upon her, but she said that she was scared and
afraid to leave. There is no contradiction of her statements
that money received from her "tricks" was paid directly to
appellant Reynolds.

Certainly, Parker benefited from the use of this money
received by Renolds, even if she did not physically transfer
the money to him. It is obvious that she could not make all of
the payments required to maintain an apartment on the
salary she received as a department store employee. The jury
could have justifiably found that part of the money procured
by prostitution was used for mutual benefit. In this case,
Parker certainly would have benefited by the conduct of
Reynolds in collecting the money. On the other hand,
Reynolds was able to collect the money and receive benefits
because of Parker's coercive conduct influencing this witness
to engage in acts of prostitution.

Finally, we examine the allegation that the court erroneously allowed the prosecution to cross-examine appellant Reynolds regarding her means of livelihood. Appellant objected to the questions relating to appellant Reynolds' prior conduct as a prostitute on the grounds that it lacked materiality or relevancy and that it exceeded the scope of direct examination. We think the court properly allowed this type of cross-examination on the theory that the questions and answers went to the proposition of appellant Reynolds' present income. In such case the probative value did outweigh the prejudicial effect upon the witness's testimony. This examination was also proper in an attempt to establish the charges for which the appellants were being tried at the time. Certainly, the fact that Reynolds may have been engaged in prostitution herself had probative value on the question of guilt or innocence in this case.

Affirmed.

. MAYS, J., not participating.